*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* A. M. BILICKI, Minor.

UNPUBLISHED
November 20, 2024
11:25 AM

Nos. 366864; 368424
Lapeer Circuit Court
Family Division
LC No. 22-012985-NA

*In re* M. A. BATES, Minor.

Nos. 366869; 366870;
368421; 368423
Lapeer Circuit Court
Family Division
LC No. 22-012945-NA

Before: K. F. KELLY, P.J., and CAVANAGH and RIORDAN, JJ.

PER CURIAM.

In these six consolidated appeals,[1] respondents appeal by right the trial court's orders assuming jurisdiction over the minor children, AMB and MAB, and the orders terminating respondents' parental rights to their respective children under MCL 712A.19b(3)(b)(*i*) (parent's act caused abuse or injury), (b)(*ii*) (failure to prevent injury or abuse), and (j) (reasonable likelihood of harm if returned to parent). Finding no errors warranting reversal, we affirm.

## I. BASIC FACTS AND PROCEDURAL HISTORY

Respondent-father and respondent-mother have one child together, MAB. Respondent-father has a six-year-old son, AMB, from a prior relationship. In November 2021, respondent-

---

[1] *In re M A Bates Minor*, unpublished order of the Court of Appeals, entered November 9, 2023 (Docket Nos. 366864, 366869, 366870, 368421, 368423, and 368424).

-1-

mother gave birth to MAB. On January 16, 2022, respondents left MAB in the care of the maternal grandmother. They intended to take care of some chores and catch up on sleep. Shortly after respondents left, the maternal grandmother became concerned because MAB seemed uncomfortable. He was pale and having trouble breathing  The maternal grandmother called respondents and recommended that they take MAB to the hospital.

Respondents returned to the maternal grandmother's home and, shortly thereafter, took MAB to the emergency room at McLaren Lapeer Regional Hospital ("McLaren"). There, respondents reported that MAB had not been taking his bottle and that he had a persistent cough. During the physical examination, McLaren staff found MAB to be obviously dehydrated and noted a small healing bruise on MAB's upper left chest. The radiologist interpreting MAB's chest x-rays found fractures on the seventh and ninth ribs, one displaced, the other nondisplaced, and a possible fracture of the left clavicle. MAB's state of dehydration made it difficult for staff to insert an intravenous line ("IV") necessary to administer fluids. As a result of this problem and other issues, MAB was transferred from McLaren to Hurley Medical Center ("Hurley"). McLaren staff also contacted Children's Protective Services ("CPS") because of the suspicious nature of the infant's fractures.

A radiologist at Hurley concluded that MAB had multiple rib fractures and possible clavicular hypoplasia, a condition where the clavicles are abnormally short or underdeveloped. The clavicular hypoplasia is a characteristic of cleidocranial dysplasia ("CCD"), a rare genetic disorder. It was also noted at both McLaren and Hurley that MAB had pectus excavatum, which is a caved-in appearance of the chest. Similar to the findings at McLaren, Hurley staff documented mild bruising over the left chest and clavicle area. In addition to the multiple fractures, MAB tested positive for respiratory syncytial virus (RSV) and rhino/enterovirus, two respiratory infections. MAB was admitted to Hurley and treated for respiratory distress, dehydration, and feeding issues. He was also given medication to manage the pain associated with the fractures.

CPS interviewed respondents at Hurley. Neither was able to provide an explanation for how MAB received multiple rib fractures. Consequently, Hurley staff referred the matter to the Child Protection Team at the University of Michigan. On January 23, 2022, MAB was discharged from Hurley, and respondents were permitted to take MAB home from the hospital; however, CPS implemented a safety plan that ensured respondents would not have any unsupervised contact with MAB. Several relatives took turns supervising respondents and MAB.

A second follow-up skeletal survey occurred on February 1, 2022. The radiologist identified several rib fractures, characterizing them variously as nondisplaced, displaced, and healing. The radiologist also identified possible fractures of MAB's wrist, shin, femur, and shin bone. The radiologist concluded that the fractures "favor[ed] nonaccidental trauma." On February 2, 2022, Dr. Bethany Mohr, Medical Director of the Michigan Medicine Child Protection Team, met with Dr. Peter Strouse, the head of pediatric radiology at the University of Michigan. Dr. Strouse informed Dr. Mohr that, in his opinion, the January 16, 2022 skeletal survey showed fractures that were missed by the original radiologist reading those images. Further, Dr. Mohr concluded that at least two of MAB's fractures were specific for abuse: the posterior right seventh rib fracture and the distal left tibia fracture. On February 14, 2022, Dr. Ayesha Ahmad, a specialist in pediatric genetics at the University of Michigan, evaluated MAB. The results of genetic testing confirmed that MAB did suffer from CCD, but ruled out the possibility that MAB suffered from

osteogenesis imperfecta, otherwise known as "brittle bone disease."  Dr. Ahmad opined that MAB's multiple fractures were not related to CCD or any metabolic bone disease.

On February 3, 2022, petitioner, the Department of Health and Human Services ("DHHS"), petitioned the trial court to authorize the petition; take jurisdiction over MAB under MCL 712A.2(b)(1) and (2); and remove the infant from respondents' care.  Following a preliminary inquiry, the court entered an ex parte order permitting DHHS to remove MAB from respondents' home.  At the February 4, 2022 preliminary hearing, the court authorized the petition, formally removed MAB from respondents' care, and ordered that reasonable efforts be made to preserve and reunify the family.  After removal, MAB was briefly placed in a licensed foster home and then with a maternal aunt and uncle.

DHHS subsequently filed a first amended petition seeking termination of respondents' parental rights to MAB under MCL 712A.19b(3)(b)($i$), (b)($ii$), (g), and (j), and also filed a petition to terminate respondent-father's parental rights to AMB.  The two matters were consolidated, and for several months the trial date was adjourned to accommodate respondents' attempts to locate an expert witness.  Respondents eventually retained three expert witnesses, but after two days of *Daubert*[2] hearings, the court only qualified one of the experts—Dr. Christopher Sullivan—to testify as an expert in pediatric orthopedics at trial.

In June 2023, after a six-day trial, a jury found there were statutory grounds for the court to take jurisdiction over the children.  On the basis of the jury's findings, the court assumed jurisdiction over MAB and AMB.  The trial court also suspended respondents' parenting time.  The statutory grounds and best-interests dispositional hearing occurred over four days between July 2023 and October 2023.  On October 20, 2023, the court found that there existed statutory grounds to terminate respondents' parental rights to their children under MCL 712A.19b(3)(b)($i$), (b)($ii$), and (j).  The court found that the fractures to MAB's ribs and legs  were caused by nonaccidental trauma.  The court also found credible the testimony from DHHS's expert that there was no genetic explanation for MAB's fractures.  The trial court found wholly implausible the opinion of Dr. Sullivan that MAB suffered from a Vitamin D deficiency, that his bones were weakened by this deficiency, and that the coughing associated with the RSV infection caused the rib fractures.  The court also noted that there was no credible evidence to support a finding that MAB was born with a Vitamin D deficiency or that he developed a deficiency.

The court also found that there was clear and convincing evidence that respondents either perpetrated the abuse or failed to protect MAB from the abuse.  The court found no support for respondents' suggestion that the injuries could have occurred when MAB was left in the care of several other family members.  Accordingly, the court found that there existed clear and convincing evidence that MAB was severely abused while in respondents' custody and that he would be harmed if returned to respondents' care.

Turning to best interests, the court considered the fact that AMB was placed with his mother but concluded that this did not constitute relative placement.  Despite the placement with

---

[2] *Daubert v Merrell Dow Pharm, Inc,* 509 US 579; 113 S Ct 2786; 125 L Ed 2d 469 (1993).

his other parent, the court found that in light of the injuries inflicted on MAB, AMB would not be safe with respondent-father. Accordingly, the court concluded that termination of respondent-father's parental rights to AMB was in the child's best interests. Regarding MAB, the court concluded that termination of both respondents' parental rights was in the child's best interests. The court considered the fact that MAB was in relative care with the maternal aunt and uncle, that a bond existed between MAB and his caregivers, and that he had spent most of his young life in this placement. The court also noted that despite the fact MAB was severely abused while in respondents' care, respondents continued to express a belief that MAB's fractures were caused by a medical condition.

On October 10, 2023, the trial court entered the orders terminating respondents' parental rights to their respective children. This appeal followed.

## II. EXPERT WITNESSES

Respondents assert that the trial court abused its discretion when it excluded the testimony of proposed experts, Dr. David Ayoub and Dr. Douglas Smith. We disagree.

## A. STANDARDS OF REVIEW

We review for an abuse of discretion a trial court's decision to admit or exclude evidence. *In re Archer*, 277 Mich App 71, 77; 744 NW2d 1 (2007). An abuse of discretion occurs when a court selects an outcome that falls outside the range of reasonable and principled outcomes. *In re Diehl*, 329 Mich App 671, 687; 944 NW2d 180 (2019). Questions of law underlying evidentiary rulings are reviewed de novo. See *In re Archer*, 277 Mich App at 77.

## B. ANALYSIS

MRE 702 sets forth the prerequisites for the admission of expert testimony. At the time the court considered the admissibility of the testimony, MRE 702 provided:[3]

> If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods of reliably to the facts of the case.

"A court considering whether to admit expert testimony under MRE 702 acts as a gatekeeper and has a fundamental duty to ensure that the proffered expert testimony is both relevant and reliable." *People v Lemons*, ___ Mich ___, ___; ___ NW3d ___ (2024) (Docket

---

[3] The Michigan Rules of Evidence were substantially amended on September 20, 2023, effective January 1, 2024. See 512 Mich lxiii (2023). This opinion relies on the version of MRE 702 in effect at the time the court held the *Daubert* hearing, adjudication, and disposition hearings.

-4-

No. 163939); slip op at 13 (quotation marks and citation omitted). MRE 702 "mandates a searching inquiry, not just of the data underlying expert testimony, but also of the manner in which the expert interprets and extrapolates from those data." *Gilbert v DaimlerChrysler Corp*, 470 Mich 749, 782; 685 NW2d 391 (2004). "[I]t is insufficient for the proponent of expert opinion merely to show that the opinion rests on data viewed as legitimate in the context of a particular area of expertise (such as medicine)." *Id*. The party proffering the evidence "must also show that any opinion based on those data expresses conclusions reached through reliable principles and methodology." *Id*.

> When a court focuses its MRE 702 inquiry on the data underlying expert opinion and neglects to evaluate the extent to which an expert extrapolates from those data in a manner consistent with *Davis–Frye* (or now *Daubert*), it runs the risk of overlooking a yawning "analytical gap" between that data and the opinion expressed by an expert. As a result, ostensibly legitimate data may serve as a Trojan horse that facilitates the surreptitious advance of junk science and spurious, unreliable opinions. [*Id*. at 783 (footnote omitted).]

## 1. TESTIMONY OF DR. AYOUB

At the May 19, 2023 *Daubert* hearing, respondents sought to have Dr. Ayoub qualified to give expert testimony in the field of diagnostic radiology but during the hearing, amended their request and sought to have this witness qualified as an expert in the area of Vitamin D deficiency. Respondents argue that, if called, Dr. Ayoub's testimony would have assisted the jury in evaluating respondents' theory that MAB's fractures were caused by a Vitamin D deficiency. Respondents further contend that the court's ruling invaded the province of the jury. Generally, when determining whether a witness is qualified as an expert, the trial court should not weigh the proffered witness's credibility. *Surman v Surman,* 277 Mich App 287, 309; 745 NW2d 802 (2017). Rather, a court's doubts as to credibility, or an opposing party's disagreement with an expert's opinion or interpretation of facts, are issues regarding the weight to be given the testimony and not its admissibility. *Id*. Finally, the issue of credibility of a witness should ordinarily be left for the trier of fact. *In re Casto*, 344 Mich App 590, 615; 2 NW3d 102 (2022).

Dr. Ayoub's testimony clearly demonstrated that he lacked the "knowledge, skill, experience, training, or education" to testify that MAB suffered from a Vitamin D deficiency, rickets, or a metabolic bone disease. Dr. Ayoub testified that he received his undergraduate and medical degrees from the University of Illinois in 1981 and 1985, respectively. He completed a one-year internship at Weiss Hospital in Chicago and a radiology residency at Southern Illinois University. After completing his residency in 1990, Dr. Ayoub did a one-year fellowship at the University of Iowa Hospitals. At the time of the May 2023 hearing, Dr. Ayoub was licensed to practice medicine in Illinois and Missouri and he was board-certified by the American Board of Radiology.

Dr. Ayoub highlighted publications included in his curriculum vitae that he believed were most relevant to his opinions in this case. In 2014, he "published" an article "on the critical review of the classic metaphyseal lesion: traumatic or metabolic?" He explained that in this article there was "considerable discussion about rickets and mimics of child abuse." In 2014, he "co-authored a paper with Doctor Miller on overpresentation of multiple pregnancies in infants with a variety

of metabolic bone diseases." He published a review article in 2015 on "congenital rickets due to maternal Vitamin D deficiency." In 2019, he coauthored a paper reporting 75 cases of contested child abuse, in which the infants had metabolic bone disease. In 2022, he coauthored an article on metabolic bone disease in infants born to mothers who had bariatric surgery and coauthored a review article "in an endocrinology journal on nutritional rickets and Vitamin D deficiency." Dr. Ayoub presented at several conferences on evidence of metabolic bone disease in contested child abuse cases.

Dr. Ayoub's curriculum vitae may have documented that he produced or contributed to the production of literature and presentations related to Vitamin D deficiency, rickets, or metabolic bone disease in children. However, his testimony was insufficient to establish that he was qualified as an expert in this regard because his testimony did not establish that by knowledge, skill, experience, training or education, he was qualified to give an expert opinion on Vitamin D deficiency, rickets, or metabolic bone disease in children.

Regarding his training, Dr. Ayoub explained that during his 1990 residency, he did a four-month rotation in pediatric radiology, at which time there was a large pediatric population at the hospital he was assigned to during his residency. He was credentialed in diagnostic radiology which included reading pediatric films. Dr. Ayoub admitted that other than training received during his residency, he did not have any special training regarding child abuse. In practice, Dr. Ayoub read x-rays for adults and children. He described the methodology used to determine the cause of fractures. The largest consideration was the history given. Dr. Ayoub stated he had diagnosed rickets in a very small number of cases, because it was very uncommon. When asked how he "carve[d] out a specialty" in the condition of rickets, Dr. Ayoub explained that he had always had an interest in pediatric bones. After he was asked by a colleague to look at a legal case where the colleague thought that a medical condition explained fractures, he engaged in a lengthy review of old literature and he studied databases. He then got involved with a group of "medical experts" that were interested in "mimics of child trauma."

When asked during DHHS's voir dire what training he had in the area of Vitamin D deficiency, Dr. Ayoub explained that as a "basic science" it was covered in medical school. As far as clinical experience, Dr. Ayoub explained that he would ask clinicians to do the testing for Vitamin D deficiency. Regarding rickets, Dr. Ayoub testified that the subject matter was on his board exams and he had lectures on rickets during his residency in 1989 or 1990. Dr. Ayoub added that he had not had any formal training on anything since he completed his residency and claimed that other than doing the work himself there was no training format to reach the degree of expertise that he had in this area. Dr. Ayoub admitted that he had not treated any patient for rickets, he only recommended treatment for a number of clinicians.

When asked if the views he expressed regarding rickets was based on science widely accepted by the general medical community and societies, Dr. Ayoub opined: "[T]hat's a very broad term. I don't work with the general medical community. I work in a subspecialty." When asked if his views on rickets were based on science widely accepted by the radiology community, Dr. Ayoub testified, "Well, they've been accepted in peer review, so it's obviously passed peer review to have been accepted." He then added: "So I would say yes, there are people that have accepted it. I would say that this is a highly politically-charged topic, and certainly prosecution

experts don't like it. So it's easy to say that they reject it. But there's plenty of people who have accepted my views. And the peer review process would support that."

Dr. Ayoub's testimony confirmed that he had no specialized knowledge or experience in treating or diagnosing children, let alone children with a Vitamin D deficiency, rickets, or a metabolic bone disease. He was not a pediatrician or a pediatric radiologist. He attributed MAB's fractures to rickets, however, his opinion was formed from reading studies and textbooks but had no credible instruction in this regard. He asserted that he always had an interest in pediatric bones so he decided to refresh his memory. He reviewed "old literature" and databases. The record did not establish that by knowledge, skill, experience, training, or education, Dr. Ayoub was qualified to represent himself as an expert in Vitamin D deficiency, rickets, or metabolic bone disease.

Further, there was insufficient evidence that Dr. Ayoub's opinions were reliable. His own testimony suggests that his opinions are not based on credible scientific methods but a belief that there is never any validity to a child abuse claim. Dr. Ayoub estimated that in over 90 percent of cases he has been asked to give an expert opinion, he opined that the child suffered from rickets. Dr. Ayoub testified that in his consulting role he did not reach opinions about whether there was abuse; rather, he testified whether there was metabolic bone disease. However, if asked, he would testify whether he saw evidence of abuse and offered that "I don't see it. And usually the state doesn't even provide it. They say we've excluded everything else, so it must be abuse." When asked if he had ever referred to child abuse as an "industry," Dr. Ayoub explained:

> I will admit there is a child abuse industry. And everybody in this room knows there is a child abuse industry, because you are part of the industry. You get paid for what you do, and many experts do. I mean, it's a business like any other business.

Dr. Ayoub—through his testimony—was unable to show that he could apply reliable principles and methods to the facts of this case, or that he possessed the requisite knowledge, skill, experience, training, or education. MRE 702. As a consequence, Dr. Ayoub's testimony would not assist the jury to understand the evidence or to determine a fact in issue. Because the record supports a finding that Dr. Ayoub lacked the necessary expertise and that his opinions were not reliable, we conclude that the trial court did not abuse its discretion when it excluded the testimony of Dr. Ayoub.

## 2. DR. SMITH

At the conclusion of Dr. Smith's testimony at the *Daubert* hearing, DHHS challenged the doctor's qualifications to testify as an expert witness. The trial court found that Dr. Smith was not qualified to testify as an expert in this case by knowledge, skill, experience, training, or education. After reviewing the record, it is also clear that the trial court did not abuse its discretion when it refused to qualify Dr. Smith as an expert witness in this case because Dr. Smith's purported areas of expertise are not relevant to the issues in the case and is not qualified to give expert testimony in the disciplines that are relevant.

Respondents argue that the trial court excluded Dr. Smith as an expert because his credentials were outdated. Although the trial court did reference the fact that a lot of Dr. Smith's

training and education went back 30 or more years and that there was no evidence that Dr. Smith had done anything to maintain, develop, or increase his knowledge, skill, and professional performance, this was not the primary rationale of the court's ruling. The court found that there was no evidence that Dr. Smith's "skill set" was relevant to the issues in this case, stating:

> Okay. So Doctor Smith was Board certified in pathology about 30 years ago. Pathology, you have the deceased bodies, and you—if you use x-rays at all, it's to guide you where to look. But you dissect the person and you examine the actual organs and body and bones to determine causation. So basically he's using this 30-year-old expertise to justify in effect he's looking at reports and x-rays.

> So the x-rays are the only thing open, really, to interpretation. And his training in reading x-rays is based on general law school—or, medical school fifty years ago, and he's not a radiologist, he's never had any specialized training in reading x-rays. He's never been certified in reading x-rays.

> His only—his involvement with genetics is running a transplant lab which matches up organs for transplants, but he doesn't even seem to know what would be necessary to be a pediatric geneticist, and that involves finding an illness and then determining what that illness—what the outcomes are, what it does, what the—to look out for, what it does to the child. And he acknowledges he doesn't have any training or experience in those areas.

> I can't find that he's an expert in the fields that you want to offer him for. You want to offer him to examine, review the records regarding this child, which doesn't have to do with pathology—it has to do with reading x-rays and looking at reports—based on some expertise that is 30 years old. Medicine changes every day. In 30 years, it changes substantially. Under the circumstances, I can't find that his testimony would be based on reliable principles and methodologies that are accepted in the legal (sic) community today, and the Court does not accept him as an expert given the testimony presented.

Respondents have not explained how Dr. Smith's areas of purported expertise were applicable to the issues in this case or how his specialized knowledge would assist the jury to determine a fact in issue. During the *Daubert* hearing, respondents sought to have Dr. Smith qualified to testify as an expert in the areas of anatomic and clinical pathology, blood banking, and transfusion medicine and pathobiology. But it is unclear from the record how Dr. Smith's purported areas of expertise in tissue matching, transplants, and blood banking were relevant to the issues presented in the case.

Respondents add to the confusion when they assert on appeal that Dr. Smith's testimony would have assisted the jury in understanding the factual issue of whether MAB's injuries could have been from Vitamin D deficiency or rickets. This representation suggests, at a minimum, that an expert would have at least some expertise or familiarity with Vitamin D deficiency or rickets. Further, as the court assumed, it was fairly obvious that maybe some expertise in reading x-rays or skeletal surveys and genetics might assist the trier or fact. Dr. Smith confirmed that expertise in the reading of x-rays was relevant in this case. He believed that respondents were contesting

the reliability of the skeletal survey for the diagnosis of metaphyseal fractures. He anticipated discussing the literature on that and the reliability of digital x-rays for determining demineralization or bone fragility. Dr. Smith identified the relevant issues where specialized knowledge would assist the jury but he did not establish that he had the knowledge, skill, training, or experience to be qualified to give expert testimony in these areas.

Regarding any expertise in radiology, Dr. Smith testified that all medical students get trained in reading x-rays. He also reviewed x-rays as part of his training in pathology. In addition, he reviewed the x-rays in the cases he consulted on and, very often, he reviewed the x-rays with radiologists or other experts qualified to read x-rays. Dr. Smith considered consulting with a radiologist to be a "form of training" in the reading of x-rays, and reviewing x-rays with other consultants was the only training Dr. Smith had in the reading of skeletal surveys. Thus, the only formal training Dr. Smith has had in reading x-rays dates back to the early 1970s when he was in medical school.

Even assuming that Dr. Smith has received that informal training in reading x-rays as described above, it is clear that he still has not attained the necessary proficiency to be deemed an expert in the reading of x-rays or radiology. When asked what gave him the expertise to give an opinion on unexplained fractures, Dr. Smith testified:

> So I have reviewed the literature on skeletal surveys. And so the literature is some information about how reliable they are for—particularly for metaphyseal fractures, which are very subtle findings and can be—and can be confused for other medical diagnoses. So I reviewed the medical literature. I reviewed the x-rays on many cases. I have consulted with radiologists and pediatricians. And, you know, there's orthopedic surgeons, et cetera, on—on the x-rays.

> Generally I'm not going to be testifying about interpreting an x-ray from scratch. If I have an x-ray report and it says there's a metaphyseal fracture in the distal left tibia, okay, I can look at the x-rays and see, you know, what's there. And I can—and I can show that to the finder of fact. But I—but if I disagree with the report, I generally will consult with a radiologist, and then the radiologist will probably be the one that's testifying about it.

Moreover, the record is devoid of any evidence that Dr. Smith has any knowledge, skill, experience, or training that would prepare him to give an opinion on the reliability of digital x-rays for determining demineralization or bone fragility. Dr. Smith testified that he had expertise in genetics and also interpreting genetic data. However, he would not say that he was a clinical geneticist and he was not board-certified in the practice of clinical genetics. Dr. Smith did a lot of research and experiments on the genetics of pigs because they were a potential donor animal for xenotransplants. There is nothing in the record that clarifies how genetic testing of pigs would be relevant to MAB's CCD or pectus excavatum.

Thus, because the record is devoid of any evidence that Dr. Smith had specialized knowledge, skill, experience, training, or education that would qualify him to testify about Vitamin

D deficiency, rickets, or radiographic imaging, the trial court did not abuse its discretion when it declined to qualify Dr. Smith as an expert in these areas.[4]

### 3. REBUTTAL EXPERT WITNESSES

Respondents also argue that the trial court abused its discretion when it permitted DHHS to call Dr. Strouse as a rebuttal witness. Respondents assert that permitting DHHS to call Dr. Strouse as a witness was an improper method to bypass the trial court's earlier ruling that DHHS was precluded from calling Dr. Strouse in its case-in-chief as a "discovery sanction." Respondents also contend that because Dr. Strouse should have been called in DHHS's case-in-chief, his testimony constituted improper rebuttal testimony. We disagree.

As an initial matter, respondents' position that the court had earlier precluded DHHS from calling Dr. Strouse in its case-in-chief as a discovery sanction is not an accurate portrayal of the events that transpired in the lower court. The court never actually imposed this discovery sanction on DHHS. There is no dispute that before the adjudicatory trial, DHHS failed to comply with MCR 3.922(A)(1)(j) because it failed to provide respondents with a copy of Dr. Strouse's CV no less than 21 days before the start of trial. Instead, DHHS e-mailed respondents the CV on May 31, 2023, five days before the trial began on June 5, 2023. Because DHHS failed to comply with MCR 3.922(A)(1), the trial court was permitted to preclude Dr. Strouse from testifying. See MCR 3.922(A)(4); MCR 2.313(C)(1) ("If a party fails to provide information or identify a witness . . . the party is not allowed to use that information or witness to supply evidence . . . at a hearing . . . unless the failure was substantially justified or is harmless."). DHHS argued that respondents were not prejudiced by the untimely submission because respondents had known since March 18, 2022, that DHHS intended to call Dr. Strouse as an expert witness.

After considering the parties' positions, the court noted that as an alternative to striking Dr. Strouse as a witness, the court could, instead, provide respondents with the requisite 21-day notice. At the conclusion of the June 6, 2023 trial proceedings, the court took the matter under advisement. When the matter resumed on June 7, 2023, during a break, an in-chambers discussion occurred off the record. When the matter reconvened, the court made the following statement:

> Okay. Well, back on the record regarding AMB and MAB. I had discussion with counsel in chambers regarding our notice issue under 3.922. And at this point,

---

[4] Even if we were to agree the trial court abused its discretion when it failed to qualify Dr. Smith and Dr. Ayoub as expert witnesses, any error in this regard was harmless. See MCR 2.613(A) ("An error in the admission or the exclusion of evidence . . . is not ground for granting a new trial, for setting aside a verdict, or for vacating, modifying, or otherwise disturbing a judgment or order, unless refusal to take this action appears to the court inconsistent with substantial justice."). Refusing to set aside the jury's verdict would not be inconsistent with substantial justice because respondents presented their theory through the expert testimony of their third proffered expert, Dr. Christopher Sullivan, who opined that MAB had a Vitamin D deficiency that weakened his bones. Dr. Sullivan also noted that because of an infection, MAB had a cough when he presented on January 16, 2022, and that coughing could cause rib fractures.

we are going to simply proceed with witnesses, and potentially there will be—the doctor in question may be called as a rebuttal, and we'll discuss that.

On June 13, 2023, after respondents rested their case, DHHS sought to call Dr. Strouse as a rebuttal witness. Respondents argued that the court had earlier found that because DHHS had not timely provided respondents with Dr. Strouse's CV, it would be precluded from calling Dr. Strouse as a witness. Further, respondents argued that because Dr. Strouse's testimony simply bolstered Dr. Mohr's opinion, it was not rebuttal testimony. Respondents argued that the purpose of rebuttal was to undercut the opponent's case and that it was improper to present testimony ostensibly in rebuttal that should have been entered in DHHS's case-in-chief.

The court acknowledged that it never foreclosed the possibility of Dr. Strouse being called as a rebuttal witness. Further, the court noted that there was no surprise because Dr. Strouse was always listed as a witness and respondents were aware of his testimony. Accordingly, the court permitted DHHS to call Dr. Strouse in its rebuttal case, and respondent's contention otherwise is not supported by the record.

Turning to respondents' contention that the admission of the testimony was an abuse of discretion because it was not proper rebuttal, respondents presented the testimony of Dr. Sullivan as an expert to testify in the fields of orthopedic surgery, pediatric orthopedic surgery, and Vitamin D deficiency. Dr. Sullivan opined, among other things, that MAB had rickets caused by a Vitamin D deficiency. Dr. Sullivan claimed that the coughing associated with an RSV infection could have caused MAB's rib fractures. Dr. Sullivan acknowledged that all baby formulas are fortified with Vitamin D so he believed that MAB's Vitamin D levels would have gradually improved over time. However, Dr. Sullivan further opined that MAB's issues with eating since birth would have affected his Vitamin D levels because he was not eating as much. Dr. Sullivan also testified that MAB did not have any fractures of his femurs or tibia. Instead, Dr. Sullivan opined that the x-rays showed signs of stripes in the growth plate that were consistent with improvement in MAB's Vitamin D levels.

"Rebuttal evidence is evidence that explains, contradicts, or otherwise refutes [an opposing party's] evidence." *Sullivan Indus, Inc v Double Seal Glass Co, Inc*, 192 Mich App 333, 348; 480 NW2d 623 (1991). "[T]he test of whether rebuttal evidence was properly admitted is not whether the evidence could have been offered in the prosecutor's case in chief, but, rather, whether the evidence is properly responsive to evidence introduced or a theory developed by the defendant." *People v Figgures*, 451 Mich 390, 399; 547 NW2d 673 (1996) (quotation marks and citations omitted). "The admission of rebuttal evidence rests largely in the discretion of the trial court." *Lopez v Gen Motors Corp*, 224 Mich App 618, 637; 569 NW2d 861 (1997).

DHHS presented Dr. Strouse's testimony to directly contradict Dr. Sullivan's opinions. Dr. Strouse was qualified to testify as an expert in diagnostic radiology and pediatric radiology. In Dr. Strouse's opinion, there was no evidence of a Vitamin D deficiency, osteopenia, or rickets. According to Dr. Strouse, MAB's bones were normally mineralized. Furthermore, Dr. Strouse explained what he saw on the skeletal survey which compelled him to conclude that MAB had small fractures on his femurs that were fairly subtle and an unequivocal fracture of the lower end of the left tibia. Dr. Strouse also explained that two fractures were highly specific for child abuse. Dr. Strouse's testimony was proper because it responded to Dr. Sullivan's opinion, made during

respondents' case-in-chief, that MAB had rickets caused by a Vitamin D deficiency, which contributed to his fractures. See *Figgures*, 451 Mich at 399. The trial court did not abuse its discretion by allowing Dr. Sullivan to testify in rebuttal.

## III. DIRECTED VERDICT

Next, respondents contend that the trial court erred when it denied their motion for directed verdict because DHHS failed to present sufficient evidence to submit the issue of jurisdiction to the jury. We disagree.

## A. STANDARDS OF REVIEW

This Court reviews de novo a trial court's decision on a motion for a directed verdict. *In re NRC*, 346 Mich App 54, 58; 11 NW3d 54 (2023). A motion for a directed verdict challenges the sufficiency of the evidence. *Barnes v 21st Century Premier Ins Co,* 334 Mich App 531, 550; 965 NW2d 121 (2020). A directed verdict is appropriate when, after viewing the evidence in the light most favorable to the nonmoving party, the court concludes that the moving party is entitled to judgment as a matter of law. *Id.* If reasonable persons could honestly reach different conclusions regarding whether the nonmoving party established a claim, the motion for a directed verdict must be denied, with the case being resolved by the jury. *Id.*

## B. ANALYSIS

"Child protective proceedings are generally divided into two phases: the adjudicative and the dispositional." *In re Brock*, 442 Mich 101, 108; 499 NW2d 752 (1993). The adjudicative phase determines whether the trial court may exercise jurisdiction over the children. *Id.* To establish jurisdiction, the petitioner must prove by a preponderance of the evidence that a statutory basis exists under MCL 712A.2(b). *In re SLH*, 277 Mich App 662, 669; 747 NW2d 547 (2008).

MCL 712A.2(b) states, in pertinent part, that a court has jurisdiction over a child in either of the following circumstances:

> (1) Whose parent or other person legally responsible for the care and maintenance of the juvenile, when able to do so, neglects or refuses to provide proper or necessary support, education, medical, surgical, or other care necessary for his or her health or morals, who is subject to a substantial risk of harm to his or her mental well-being, who is abandoned by his or her parents, guardian, or other custodian, or who is without proper custody or guardianship. . . .

> (2) Whose home or environment, by reason of neglect, cruelty, drunkenness, criminality, or depravity on the part of a parent, guardian, nonparent adult, or other custodian, is an unfit place for the juvenile to live in.

DHHS petitioned the court to take jurisdiction over both children on the basis that one or both respondents either caused or failed to prevent MAB's injuries and neglected or refused to provide proper or necessary support for AMB. The evidence overwhelming established that MAB, two months old at the time, was the victim of severe physical abuse. CPS interviewed respondents and neither was able to provide an explanation for how MAB received multiple rib fractures.

-12-

Further, the testimony of several experts supported a finding that MAB was physically abused. The results of genetic testing confirmed that MAB did not have a medical or genetic condition that would explain the multiple rib fractures and fractures in the lower extremities.

Dr. Mohr, the medical director of the Michigan Medicine Child Protection Team testified that MAB had seven rib fractures on the right and three rib fractures on the left, which at the time were 10 to 14 days old. One rib fracture, the right seventh rib, was posterior, or near his backbone. This location for a rib fracture on its own was highly specific for abuse by squeezing. MAB also had a classic metaphyseal fracture that was highly specific for abuse because it usually occurred through grabbing, twisting, or yanking of an extremity. Dr. Mohr testified that MAB's RSV-related cough, swaddling him too tightly, or holding him down would not explain MAB's 11 rib fractures. Dr. Mohr also explained that the bruises on MAB's body were concerning because nonmobile infants are typically unable to create enough force to inflict bruises on themselves.

Dr. Strouse, a pediatric radiologist, confirmed that the skeletal surveys depicted multiple rib and leg fractures. In addition, Dr. Strouse opined that MAB did not have a medical condition that would predispose him to fractures. Dr. Strouse noted that MAB's bones were normally mineralized and he did not have osteopenia, a condition where the bones are not normally mineralized. Dr. Strouse also opined that the multiple fractures were consistent with physical abuse.

There was also testimony regarding respondent-father's six-year-old son, AMB. AMB's mother testified that for the first few years of AMB's life, respondent-father denied paternity. After paternity was established in 2018, respondent-father still would not regularly visit AMB and he did not consistently pay his child support obligations. Respondent-father also did not attend any of AMB's medical appointments or participate in AMB's school activities.

Viewing the evidence in the light most favorable to DHHS, a jury could conclude that respondent-father, respondent-mother, or both parents physically abused MAB or failed to protect him from the abuse. Moreover, there was evidence that respondent-father neglected AMB. Thus, there was sufficient evidence to enable the jury to find a statutory basis for jurisdiction by a preponderance of the evidence. Accordingly, the trial court did not err when it denied respondents' motion for a directed verdict.

## IV. STATUTORY GROUNDS

Respondents argue that the trial court erred when it found statutory grounds to terminate their parental rights. We disagree.

## A. STANDARDS OF REVIEW

"The trial court's decision that a ground for termination of parental rights has been proved by clear and convincing evidence is reviewed for clear error." *In re Pops*, 315 Mich App 590, 593; 890 NW2d 902 (2016). "A finding of fact is clearly erroneous if the reviewing court has a definite and firm conviction that a mistake has been committed, giving due regard to the trial court's special opportunity to observe the witnesses." *In re BZ*, 264 Mich App 286, 296-297; 690 NW2d 505 (2004). "This Court gives deference to a trial court's special opportunity to judge the

weight of the evidence and the credibility of the witnesses who appear before it." *In re TK*, 306 Mich App 698, 710; 859 NW2d 208 (2014). "Only one statutory ground need be established by clear and convincing evidence to terminate a respondent's parental rights, even if the court erroneously found sufficient evidence under other statutory grounds." *In re Ellis*, 294 Mich App 30, 32; 817 NW2d 111 (2011).

## B. ANALYSIS

The trial court terminated respondents' parental rights to their respective children under MCL 712A.19b(3)(b)(*i*), (b)(*ii*) and (j), which permit termination of parental rights under the following circumstances:

> (b) The child or a sibling of the child has suffered physical injury or physical or sexual abuse under 1 or more of the following circumstances:

> (*i*) The parent's act caused the physical injury or physical or sexual abuse and the court finds that there is a reasonable likelihood that the child will suffer from injury or abuse in the foreseeable future if placed in the parent's home.

> (*ii*) The parent who had the opportunity to prevent the physical injury or physical or sexual abuse failed to do so and the court finds that there is a reasonable likelihood that the child will suffer injury or abuse in the foreseeable future if placed in the parent's home.

> * * *

> (j) There is a reasonable likelihood, based on the conduct or capacity of the child's parent, that the child will be harmed if the child is returned to the home of the parent.

Initially, we note that on appeal respondents did not specifically address the termination of their parental rights under MCL 712A.19b(3)(j). "The failure to brief the merits of an allegation of error is deemed an abandonment of an issue." *In re JS & SM*, 231 Mich App 92, 98; 585 NW2d 326 (1998), overruled in part on other grounds by *In re Trejo*, 462 Mich 341, 353 n 10; 612 NW2d 407 (2000). Further, a challenge to this ground for termination was not identified in respondents' statement of the questions involved. As a result, appellate review of this issue is considered waived because respondents failed to properly present this issue for review. *In re BKD*, 246 Mich App 212, 218; 631 NW2d 353 (2001). Furthermore, because only one statutory ground for termination must be established by clear and convincing evidence, respondents' failure to challenge the trial court's finding with respect to MCL 712A.19b(3)(j) precludes appellate relief with respect to their challenge to the statutory grounds for termination. *In re JS & SM*, 231 Mich App at 98.

But even if the issue were not waived, the trial court did not clearly err when it found there to be statutory grounds for termination. Because the petition sought termination of respondents' parental rights at the initial disposition, the trial court was permitted to consider both the evidence that was introduced at the adjudication trial and the evidence presented at the dispositional hearing in determining whether there existed clear and convincing evidence of a statutory ground to

-14-

terminate respondents' parental rights. See MCR 3.977(E)(3). As discussed above, it is undisputed that MAB sustained severe injuries. Respondents could articulate no plausible explanation for these injures. Further, respondents testified that during the week leading up to January 16, 2022, MAB was very ill. He was not eating, was constipated, congested, and had a persistent cough. Then, on January 14, 2022, both respondents noticed that MAB's side looked odd. Yet they failed to seek medical care. Indeed, on the morning of January 16, 2022, they left a very ill, severely dehydrated infant in the care of the maternal grandmother.

Further, testimony from experts in the fields of child abuse pediatrics, radiology, and genetics opined that MAB did not have a medical condition or genetic disorder that contributed to the fractures. Instead, the injuries were caused by nonaccidental trauma. Although the foregoing evidence satisfied the preponderance of the evidence standard to exercise jurisdiction over the children, this same body of evidence met the more demanding evidentiary standard of clear and convincing. That is, there was clear and convincing evidence to terminate respondents' parental rights under each of MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (j).

It was not necessary for DHHS's evidence to conclusively establish which parent perpetrated the physical abuse. In *In re Ellis*, 294 Mich App at 35-36, this Court held that "termination of parental rights under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), (j), and (k)(*iii*) is permissible even in the absence of definitive evidence regarding the identity of the perpetrator when the evidence does show that the respondent or respondents must have either caused or failed to prevent the child's injuries." The Court reasoned that "when there is severe injury to an infant, it does not matter whether respondents committed the abuse at all, because under these circumstances there was clear and convincing evidence that they did not provide proper care." *Id*. at 33. Moreover, there was clear and convincing evidence from which the court could find that there was a reasonable likelihood that the children would suffer injury or abuse in the foreseeable future if placed in respondents' home. The most compelling evidence that respondents would be unwilling or unable to protect their children from known risks of harm was their continued insistence, despite compelling evidence to the contrary, that MAB's fractures were related to a medical condition or genetic disorder.

Accordingly, the trial court did not clearly err when it found clear and convincing evidence to terminate respondents' parental rights to the children under MCL 712A.19b(3)(b)(*i*), (b)(*ii*), and (j).

Respondents also argue that because the trial court never made an aggravated circumstances finding, DHHS was required to make reasonable efforts toward reunification. Respondents have affectively abandoned this issue because it is not included in the statement of questions presented. *In re Rippy*, 330 Mich App 350, 362 n 5; 948 NW2d 131 (2019); MCR 7.212(C)(5). Further, respondents never raised this issue below, accordingly it is not properly preserved. *In re Atchley*, 341 Mich App 332; 337-338; 990 NW2d 685 (2022). Our review, therefore, is limited to plain error affecting respondents' substantial rights. *In re Barber/Espinoza*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 369359); slip op at 3. "To avoid forfeiture under the plain error rule, three requirements must be met: 1) error must have occurred, 2) the error was plain, i.e., clear or obvious, 3) and the plain error affected substantial rights." *People v Carines*, 460 Mich 750, 763; 597 NW2d 130 (1999); see also *In re VanDalen*, 293 Mich App 120, 135, 809 NW2d 412 (2011). "Generally, an error affects substantial rights if it caused

-15-

prejudice, i.e., it affected the outcome of the proceedings." *In re Utrera*, 281 Mich App 1, 9; 761 NW2d 253 (2008); see also *Carines*, 460 Mich at 763.

The trial court never made an aggravated circumstance finding so as to relieve DHHS from making reasonable efforts because, when the court authorized the petitions, it indeed ordered that DHHS make reasonable efforts toward reunification. Early on, however, respondents' counsel made it clear that other than coordinating parenting time, DHHS was not to have any contact with respondents regarding the case. On March 8, 2023, the court entered an order following a dispositional review and permanency planning hearing. The order found that reasonable efforts were made to preserve and reunify the family. The court noted that these reasonable efforts included supervised parenting time, the offer of a parent-agency treatment plan ("PATP"), counseling services, parenting skills, a psychological evaluation, DHHS case management services, budgeting assistance, parenting education, a safety plan, and family team meetings. In addition to these services, respondent-father was also offered random drug screens and rehabilitation services. The court's order noted that respondents had been offered these services but, other than supervised parenting time, they had not availed themselves of the treatments and services offered.

Despite their resistance to formally participate in the offered PATP, there was evidence that respondents participated in some services. Respondents consistently attended supervised parenting time with the children. While no verification had been provided, respondents reported that they were attending counseling. Respondents also complied with the caseworker's referral to parenting education classes. Respondents were referred to and received services through Spectrum, one of the entities that supervised parenting time. Spectrum's program provided parenting education for a half-hour and then an hour of supervised parenting time would follow. The Spectrum program was 13-weeks long but, because of the length of this case, respondents were referred multiple times to participate in this program.

Respondents have, therefore, failed to establish error, let alone plain error that affected their substantial rights, concerning the issue of reunification.

## V. BEST INTERESTS

Lastly, respondents contend that the trial court clearly erred when it found that termination of their parental rights was in the children's best interest. We disagree.

## A. STANDARDS OF REVIEW

The trial court's decision regarding best interests is reviewed for clear error. *In re Schadler*, 315 Mich App 406, 408; 890 NW2d 676 (2016). "A finding is clearly erroneous if the reviewing court is left with a definite and firm conviction that a mistake has been made," with the reviewing court "defer[ring] to the special ability of the trial court to judge the credibility of witnesses." *In re LaFrance*, 306 Mich App 713, 723; 858 NW2d 143 (2014).

## B. ANALYSIS

"If the court finds that there are grounds for termination of parental rights and that termination of parental rights is in the child's best interests, the court shall order termination of parental rights and order that additional efforts for reunification of the child with the parent not be made." MCL 712A.19b(5). When considering whether termination of parental rights is in a child's best interests, a court may consider a variety of factors. *In re White*, 303 Mich App 701, 713; 846 NW2d 61 (2014). These factors include the bond between the child and the parent, the parent's ability to parent the child, the child's need for permanency and stability, the advantages of a foster home over the parent's home, the parent's compliance with the case service plan, the parent's visitation history with the child, the child's well-being, and the possibility of adoption. *Id*. at 713-714. In addition, the trial court should consider the child's safety and well-being, including the risk of harm a child might face if returned to the parent's care. See *In re Van Dalen*, 293 Mich App 120, 142; 809 NW2d 412 (2011). The court may also consider psychological evaluations, the child's age, continued involvement in domestic violence, and a parent's history. *In re Jones*, 286 Mich App 126, 131; 777 NW2d 728 (2009).

"The trial court should weigh all the evidence available to determine the children's best interests." *In re White*, 303 Mich App at 713. The court's focus must be on the child and not the parent. *In re Moss*, 301 Mich App 76, 87; 836 NW2d 182 (2013). Whether termination of parental rights is in a child's best interests must be proven by a preponderance of the evidence. *Id*. at 90. This Court reviews for clear error a trial court's finding that termination of parental rights is in a child's best interests. *In re Jones*, 286 Mich App at 129.

The trial court did not clearly err when it found that termination of respondents' parental rights was in the children's best interests. There was overwhelming evidence that the children would not be safe in respondents' care. Respondents were responsible for serious injuries to MAB that respondents continue to assert that MAB's fractures were caused by a medical issue or genetic disorder.

Regarding respondent-father's parental rights to his son AMB, the court noted that AMB was placed in the sole custody of his mother and had been even before these proceedings. Respondent-father had little contact with AMB before the petition, and he had never participated in typical parental activities like attending medical appointments and school functions. There was also evidence that respondent-father did not consistently pay his child support. When parenting time became more regular because of the visitation schedule, AMB's feelings were hurt because respondent-father gave most of his attention to MAB and was inattentive during AMB's birthday. Even when visits were separated, AMB was more interested in engaging with respondent-mother than respondent-father. Although respondent-father asserts that the parent-child bond was a factor that weighed against termination, it is clear that any bond that exists was weak. The court found that risk of harm to AMB was so great that even just visits with respondent-father would not be in AMB's best interest. This was not clearly erroneous.

MAB was placed with his maternal aunt and uncle. All of his needs were being met and the aunt and uncle were willing to adopt MAB. When considering a child's best interests, the court may consider the advantages of a foster home over the parent's home. *In re Olive/Metts*, 297 Mich App 35, 42; 823 NW2d 144 (2012). A preponderance of the evidence indicated that MAB's home with his maternal aunt and uncle was preferable to the home respondents could provide MAB.

Respondent-mother argues separately that the trial court failed to consider that MAB's placement with relatives was a factor that weighed against termination of her parental rights. We disagree. The trial court acknowledged that MAB was placed with a relative and that this was a factor that favored reunification, but it went on to properly balance relative placement with a very significant fact, the safety of the children. In this case, the trial court properly balanced relevant factors and did not clearly err by finding that termination of respondents' parental rights was in MAB's best interests, despite his placement with a relative.

On this record, the trial court did not clearly err when it found that termination of respondent-father's parental rights was in MAB's and AMB's best interests and the termination of respondent-mother's parental rights was similarly in MAB's best interests. Respondents were unable to ensure the children's safety, and continuing a parent-child relationship would have been detrimental to the children's physical, educational, and emotional well-being. Accordingly, the trial court did not clearly err when it concluded that termination of respondents' parental rights was in the children's best interests.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Mark J. Cavanagh
/s/ Michael J. Riordan